UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                       ) | CRIMINAL NO. 11-10018-RWZ |
| ) | |
| BRYAN FITZPATRICK         ) | |

DEFENDANT'S SENTENCING MEMORANDUM
(REDACTED)

Defendant Bryan Fitzpatrick respectfully submits this memorandum to assist the Court in sentencing.

Defendant pleaded guilty on May 5, 2011 to a single count of unarmed bank robbery, under 18 U.S.C. § 2113(a). His guideline, conventionally applied, would be TOL 19 in CHC VI, so 63-78 months. According to the presentence report, he is a career offender with resulting guideline of 29 in CHC VI, so 151-188 months. The predicates for career offender are a prior state-court unarmed bank robbery, and a marijuana distribution charge from 1998, when he was 17, involving a single $10 bag of marijuana.

Since the Sentencing Guidelines are no longer binding on the Court, United States v. Booker, 125 S.Ct. 738 (2005), this Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in section 3553(a)(2).

1.  <u>Offense Conduct</u>

On June 29, 2011, Fitzpatrick entered a Sovereign Bank in Quincy.  He approached a teller window, but was told to move to a different line, which he did.  There, without speaking, he handed over a demand note to the teller which said simply "No dye packs, this is a robbery."  He was given $1,020 and he left the bank. He was unarmed.

He was arrested without incident the following day.  He promptly waived his Miranda Rights and explained to police that he had first entered the bank but walked out, unnerved and "scared."  See Report of Det. Rick Walsh, Quincy P.D. at 2.  He drank some alcohol "to give him[self] the courage" to go through with the robbery and reentered.  He took the money and fled.  <u>Id</u>.

2.  <u>History And Characteristics Of Defendant</u>

Fitzpatrick,

3.  A Departure is Appropriate Due to Defendant's Extraordinary Psychological Difficulties Arising from Childhood Sexual Trauma

The Sentencing Guidelines provide for downward departures where "there exists ... [a] mitigating circumstance ... of a kind or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. §3553(a)(2), should result in a sentence different from that described." Sentencing Guidelines §5K2.0 (Policy Statement).  In this case, the abuse suffered by Fitzpatrick was so "extraordinary" that it "can be assumed to [have] caused mental or emotional pathology". United States v. Rivera, 192 F. 3d 81, 86 (2nd Cir. 1999).

Fitzpatrick's

He entered the bank only to retreat, and needed alcohol to get up the nerve to go back. Hardly the picture of the hardened career criminal.

His immediate past crime, which also landed him in prison, was similarly a bank robbery with a note. As the Court is aware, note jobs are almost always committed by drug addicts and follow a predicable (and unsuccessful) course: a quick payout from a compliant teller followed by certain capture. These offenses, almost without exception, are committed by addicts who might more productively surrender at the local police station. It is not to demean the seriousness of the crime to say that perpetrators are, as a group, drug addicted and mere days from capture.

It is also a population which would generally benefit from intensive drug treatment with associated mental health services. As too frequently happens, however, Fitzpatrick's root problems have gone untreated.

A downward departure is warranted where the criminal conduct is rooted in -------------------- which burdened his development. Compassion alone supports some consideration for his difficulties.

4.  <u>The Court Should Depart Below the Career Offender Guideline</u>

Courts have recognized that the career offender guideline may conflict with the directive in 18 U.S.C. § 3553(a) for courts to impose a sentence "sufficient, but not greater than necessary" to comply with the criteria set forth in that statute.  <u>See</u> <u>United States v. Martin</u>, 520 F.3d 87, 96 (1st Cir. 2008) (affirming sentence 91 months below career offender guideline, noting that sentencing court may "deviate from the guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission"); <u>United States v. Caraballo</u>, 447 F.3d 36 (1st Cir. 2006).

Defendant submits that the career offender guideline should not be applied because 1) it does not rooted in empirically based sentencing practices, and 2) as applied to defendant, it overstates his criminal history and likely recidivism.  These issues are addressed below.

   A.  <u>The Career Offender Guideline Is Not Entitled to Deference From This Court</u>

Departures in career offender cases were "common country-wide," even before the guidelines became advisory.  <u>United States v. Ennis</u>, 468 F. Supp. 2d 228, 234 (D. Mass. 2006).  The Commission itself explained why: sentences under the career offender guideline are among the most severe and least likely to promote sentencing purposes in the entire guidelines manual. See

USSC, "Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform" ("Fifteen Year Review") at 133-34 (2004).

Where a sentencing guideline does not reflect "empirical data and national experience" and "do[es] not exemplify the Commission's exercise of its characteristic institutional role," sentencing courts are authorized to conclude that the guideline should not apply, "even in a mine-run case." Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558, 574-75 (2007).  The career offender guideline, U.S.S.G. § 4B1.1, is just such a guideline: it does not rely on past practice and it has not been reviewed or revised to reflect empirical data and national experience.  See Amy Baron-Evans, Jennifer Niles Coffin, and Sara Noonan, Deconstructing the Career Offender Guideline (August 29, 2008), http://www.fd.org/odstb_SentDECON.htm.

When Congress first enacted the Sentencing Reform Act in 1984, it instructed the U.S. Sentencing Commission to base the Sentencing Guidelines on the purposes of sentencing listed in 18 U.S.C. § 3553(a)(2).  See 28 U.S.C. § 991(b).  But when the original Commissioners could not agree on how to weight the different statutory purposes, they decided to adopt an empirical approach that "used as a starting point data estimating pre-guidelines sentencing practice."  U.S.S.G. Chapter One, Part A

1.3 ("The Basic Approach").  Since then, the Supreme Court has accepted this empirical approach as a fair approximation of the § 3553(a)(2) factors.  See Rita v. United States, 551 U.S. 338, 350 (2007).  Importantly, however, as the Court has correctly recognized, "not all of the Guidelines are tied to this empirical evidence."  Gall, 128 S.Ct. at 594 n.2.  Even when first promulgated, the career offender guideline did not reflect "empirical data and national experience" and did not "exemplify the Commission's exercise of its characteristic institutional role."  Kimbrough, 128 S.Ct. at 575.

As time went on, the career offender guideline widened its reach to a broader array of defendants and offenses far beyond what Congress originally intended.  More particularly, the best empirical evidence currently available suggests that, contrary to the parsimony provision in 18 U.S.C. § 3353(a), the career guideline offender guideline frequently results in sentences "greater than necessary" to achieve the goals of sentencing. See, id. at 32-39.

Of particular note here, the recidivism rate of those whose career offender status was based on one or more prior "crimes of violence" was about 52%.  See Fifteen Year Review at n.1, 134. Only 12.5% of such persons, however, were charged with a "serious violent offense," defined as homicide, kidnaping, robbery, sexual assault, aggravated assault, domestic violence, and weapons

offenses, and only 4.1% were drug trafficking.  See U.S.S.C., <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u> at 32, available at http://www.ussc.gov/publicat/Recidivism_General.pdf103.  The largest proportion of recidivating events (38.3%) were probation or supervised release revocations, <u>id</u>., which can be anything from failing a drug test to failing to appear at a probation office's request.

Enormous sentences are imposed on persons whose recidivism rates for significant crimes are modest and whose problems generally relate to taming their drug issues.

5. <u>The Career Offender Guideline Overstates Mr. Fitzpatrick's Criminal History and Likely Recidivism</u>

Fitzpatrick's predicates are unarmed bank robbery from 2007, and a long-past marijuana distribution case from 1998, when he was 17.  The latter charge involved a single $10 bag of marijuana, and is only countable now, thirteen years later, because he was violated on his probation and received an 18 month sentence.  Under the timing standards of U.S.S.G. § 4A1.2(e), this subsequent revocation revived an otherwise time-barred conviction.  Thus, a revocation sentence from 11 years ago, regarding sale of a $10 bag of marijuana, propels a 250% increase in the sentencing exposure, from 63-78 months to the career offender range of 151-188 months.

A downward departure is appropriate if 1) the defendant's criminal history category over-represents the seriousness of the defendant's criminal history or 2) the likelihood that the defendant will recidivate.  U.S.S.G. § 4A1.3(a)(1).

Designating defendant as a career offender significantly over-represents the likelihood that he will commit further crimes after his release from incarceration.  This can be shown either through the circumstances of a particular defendant's criminal history, see United States v. Collins, 122 F.3d 1297 (10th Cir. 1997), or that the future risk that a particular offender will recidivate is low, see United States v. Lawrence, 916 F.2d 553 (9th Cir. 1990).  See United States v. Woodley, 344 F.Supp.2d 274 (D.Mass. 2004).

In these circumstances, the court can depart to reflect the reduced likelihood of recidivism should defendant receive treatment for both his substance abuse treatment and his underlying psychological issues.

In numerous cases in this District, courts have departed from career offender sentences.  See United States v. Edward Brady, Criminal No. 99-10425-RWZ (September 12, 2000) (in a drug distribution charge, this Court imposed 84 months, and later ordered early termination of supervision); United States v. Woodley, 344 F.Supp.2d 274 (D.Mass. 2004) (in a bank robbery case, court imposed 84 months due to overstatement of criminal

history and extraordinary rehabilitation); United States v. David Glavin, Criminal No. 04-10093-MLW (in a bank robbery case, court departed from 151-188 guideline to 86 months where defendant grew up under particularly miserable circumstances thus developed heroin addiction and where the steady history of crimes which led to career offender status are the kinds of offenses typically associated with addicts who need to feed a drug habit); United States v. Politis, Criminal No. 08-10180-MLW (in a bank robbery case, departure from career offender to 84 months, since "Defendant's many bank robberies were non-violent and driven by his drug addiction. He showed extraordinary acceptance of responsibility by confessing to nine bank robberies of which the government was unaware. Defendant is now dedicated to getting effective treatment for his powerful addiction, which will reduce the risk of recidivism."); United States v. Barrett, Criminal No. 01-10450-PBS (on a charge of bank robbery, with a guideline of 151-188 months, the court imposed 84 months ruling "The government did not oppose the motion for downward departure based on a combination of factors, including extraordinary physical impairments and post-offense, pre-arrest rehabilitation."); United States v. Stephen Wright, Criminal No. 97-10287-EFH (July 30, 1998) (on charge of unarmed bank robbery with guideline range of 151-188 months, sentenced to 46 months on ground that defendant's criminal history category significantly

over-represented the seriousness of the defendant's criminal history and the likelihood that the defendant would commit further crimes); United States v. Beverly, Criminal No. 03-10042-MLW (in a bank robbery case, reduction to 120 months sentence for overstatement of criminal history: "... a departure to the range that would have existed if the defendant was not a career offender was most appropriate."); United States v. Trent Miller, Criminal No. 06-10291-JLT (in a repeat-offense bank robbery, court after trial imposed 87 months for a defendant who lacked the mitigating history of abuse and drug addiction, and who was not entitled to adjustment for acceptance of responsibility); United States v. Kevin McGrath, Criminal No. 98-10302-MLW (May 2, 2000) (on charge of unarmed bank robbery with guideline range of 151-188 months, defendant sentenced to 108 months on ground that "Defendant's Criminal History significantly over represents the likelihood the defendant will commit crimes in the future"); United States v. Joseph Burhoe, Criminal No. 01-CR 10464-RCL (in bank robbery case departing from 151-188 guideline to 77 months where sentence was "sufficiently lengthy to serve as a deterrent to this defendant and others" and there was "documented psychological scarring as a consequence of years of childhood... abuse"); United States v. David Laperle, Criminal No. 00-10021-MLW (October 17, 2001) (departing from 151-188 month range in career offender bank robbery case to 84

months based on finding that career offender status "significantly overrepresented the risk of recidivism if he receives the treatment prescribed by this sentence").

6.  The High Costs of Excessive Incarceration

At the inception of the era of guidelines, the Sentencing Commission predicted that the guidelines would "lead to an increase in prison population that computer models, produced by the Commission and the Bureau of Prisons, estimate at approximately 10 percent over a period of ten years." U.S.S.G. Introduction, § 1A1.1, para. 4(g). Instead, the prison population has increased dramatically. The 1986 prison population, federal and state, was 544,972. According to the Department of Justice statistics, http://www.ojp.gov/bjs/prisons.htm, "as of June 30, 2006, 2,245,189 prisoners were held in Federal or State prisons or in local jails -- an increase of 2.8% from midyear 2005, less than the average annual growth of 3.4% since yearend 1995." There were "an estimated 497 prison inmates per 100,000 U.S. residents -- up from 411 at yearend 1995." This has only increased. According to a report from the Center for Economic and Policy Research, entitled The High Budgetary Cost of Incarceration, June 2010: "The United States currently incarcerates a higher share of its population than any other country in the world. The U.S.

incarceration rate -- 753 per 100,000 people in 2008 -- is now about 240 percent higher than it was in 1980."

Supreme Court Justice Anthony M. Kennedy offered a critical view of criminal justice in the United States:  "Our resources are misspent, our punishments too severe, our sentences too long."  In his widely reported speech to the American Bar Association on August 9, 2003, Justice Kennedy also noted that, at the time: "Our incarceration rate in the US, per capita, is about eight times as high as that of England, France or Germany. Their per capita incarceration rate is about 1 in 1,000.  Ours is one in 143."

The cost, both social and economic, on our nation's reliance on prisons as the principal vehicle for deterrence and punishment is well documented.  A report of the Boston Foundation is also informative, which notes that in Massachusetts alone the number of people held in state prisons surged by 300 percent, and the number in county jails by about 320 percent, from 1980 to the mid-1990s.  Priorities and Public Safety: Reentry and the Rising Costs of our Corrections System, December 3, 2009, www.tbf.org. Spending on prisons and jails in Massachusetts has surpassed spending on higher education, as of 2003, with investments in corrections crowding out spending on other important priorities. The report of the Center for Economic and Policy Research states:

> We calculate that a reduction by one-half in the
> incarceration rate of non-violent offenders would lower

>   correctional expenditures by $16.9 billion per year and
>   return the U.S. to about the same incarceration rate we had
>   in 1993 (which was already high by historical standards).
>   The large majority of these savings would accrue to
>   financially squeezed state and local governments, amounting
>   to about one-fourth of their annual corrections budgets.  As
>   a group, state governments could save $7.6 billion, while
>   local governments could save $7.2 billion.  A review of the
>   extensive research on incarceration and crime suggests that
>   these savings could be achieved without any appreciable
>   deterioration in public safety.

The High Budgetary Cost of Incarceration, supra.

## 7.   The Effect of Defendant's Current State-Court Custody

Defendant was initially charged in state court on July 1, 2010.  The charge caused revocation of his probation on his prior unarmed bank robbery charge, effective August 12, 2010.  PSR ¶ 47.  So he is currently serving the imposed state sentence of 2 years to 2 years and a day committed.  He cannot receive credit for the elapsed period of this sentence, from August 12, 2010 to the date of his federal sentencing, see 18 U.S.C. § 3585(b), as the time is being "credited against another sentence."  He can only receive credit prospectively, if this Court orders the sentence here to be served concurrently with the state sentence.

The effect is that defendant has already been in custody for one year, time which cannot be recaptured for calculation or credit in any term to be imposed by this Court.

## Conclusion

For each of these reasons, defendant asks the Court to sentence him to five years, to be served concurrently with the

remaining part of the revocation sentence now being served in state court.  (Defendant has already served a year in prison, which cannot be credited against the current sentence.) Defendant further asks, in order to ensure that he receives extended community reintegration services at the conclusion of his sentence, that this Court impose as a condition of supervised release that he serve the first six months in a community treatment facility.  If these proposed elements are combined (and factoring in the already-served part of the revocation sentence), the effective period of custody would be six and one-half years.

BRYAN FITZPATRICK
By his attorney,

/s/ Charles P. McGinty

Charles P. McGinty
  B.B.O. #333480
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 11, 2011.

/s/ Charles P. McGinty

Charles P. McGinty